### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | |
|---|---|
| Amber and Nathan Miller, on behalf of their minor child, L.M., | Case No. _____ |
| *Plaintiffs*, | |
| v. | |
| City of Portland, Maine; City of South Portland, Maine; Daniel Ahern, in his official capacity as South Portland Chief of Police; Lieutenant Ben Macisso, in his individual capacity and in his official capacity as Portland and South Portland SWAT Commander; Sergeant Jake Hall, Detective Lieutenant Chris Todd, Detective Jonathan Stearns, Officer Caleb Gray, Officer Anthony Verville, and John Doe Officers, in their individual capacities, | |
| *Defendants*. | |

### PLAINTIFFS' COMPLAINT

HERON LEGAL YOUTH ADVOCACY

Nealy Fleming
Maine Bar No. 10946
fleming@heron-legal.com

Michael Rogers
Maine Bar No. 10768
rogers@heron-legal.com

4 Moulton St., 3rd Floor
Portland, ME 04101
207-772-7426 (phone)
207-761-5822 (fax)

INSTITUTE FOR JUSTICE

Marie Miller*
Indiana Bar No. 34591-53
3200 N. Central Ave. Ste. 2160
480-557-8300 (phone)
480-557-8305 (fax)
mmiller@ij.org

Jaba Tsitsuashvili*
California Bar No. 309012
901 N. Glebe Rd. Ste. 900
Arlington, VA 22203
703-682-9320 (phone)
703-682-9321 (fax)

* *Pro hac vice* certifications to be filed

*Counsel for Plaintiffs*

## INTRODUCTION

1.      This is a civil-rights case serving a public interest.

2.      Police officers searching for a nonviolent suspect erroneously and unreasonably seized an innocent sixteen-year-old at gunpoint during his school lunch break and then did not let him go once they discovered their error. Instead, they baselessly handcuffed, searched, and questioned him.

3.      To begin with, the officers used militarized weapons and techniques unreasonably. The officers were investigating only nonviolent, weaponless criminal conduct: the taking of several pairs of shoes and cologne during a house party. The sought-after suspect had no history of crime, violence, possession of weapons, or hostility toward police. The officers aimed loaded assault rifles at minors who were outside in a residential neighborhood less than a block away from Deering High School, when the school had released its nearly 900 students from campus for lunch. The officers faced no exigencies in their investigation. And yet the officers neither notified the school about the planned operation nor asked the school to keep students on campus during it.

4.      The officers also should have known from the start that the sixteen-year-old they seized at gunpoint, L.M., was not the suspect. The officers were looking for a nineteen-year-old who was about 4 inches shorter and 30 pounds lighter than L.M., who had significantly shorter hair, and who had a large and prominent tattoo on his arm. The officers should have known the suspect was not at home in the neighborhood next to Deering High School when the officers went there. (They should have known that he was, as usual midday on a Tuesday, at work at an elder care facility in a neighboring town.) The officers also should have known that hundreds of teenagers matching the suspect's gender, basic age, and general skin and hair color were in the immediate area, having just been released from school. When the officers seized L.M.

2

at gunpoint, they did so based solely on his gender, his general age and coloring, and his presence down the street from the suspect's home near the school. Officers saw only L.M.'s back side when they seized him and aimed assault rifles at him. Still, the officers should have noticed at least that L.M. had much longer hair than the suspect and that he had no tattoos on his arms, exposed by L.M.'s short-sleeved T-shirt. L.M.'s friends also told the officers that L.M. was not the person the officers were calling him (the suspect's name).

5.    The officers at last confirmed that L.M. was not the suspect when they were about to put his hands in cuffs behind his back. At that point, the officers could not ignore the absence of tattoos on L.M.'s arms. And they had gotten a close look at his face, which did not match the photo of the suspect that the officers had.

6.    Still, even after the officers knew they had seized the wrong person, they did not let L.M. go. That is because—as the police chief and another officer would later explain—it is policy for officers to keep a person detained in this situation, regardless of whether officers now know he is not the suspect, until after the officers have put him in handcuffs and learned the detainee's true identity.

7.    So, instead of releasing L.M., the officers handcuffed him, questioned him, and searched him without any basis to believe he was involved in criminal activity, was armed, or was dangerous.

8.    The officers let L.M. go only after he had been threatened with deadly force, handcuffed, searched, questioned, and thoroughly frightened, confused, and humiliated in front of a large crowd of his peers, who had gathered between the school and the police.

9.    After the incident, the South Portland police chief confirmed that L.M. did nothing wrong; he acted respectfully and did everything right in complying with officers' commands and otherwise reacting to the situation. The police chief also endorsed the officers' conduct, saying that they did everything according to city

policies and their training; if they were to encounter the same circumstances in the future, they would do the same things.

10.     L.M.'s parents, Amber and Nathan Miller, assert on his behalf claims against the officers' city employers and the officers, themselves. The Millers assert claims under 42 U.S.C. § 1983 for violations of L.M.'s Fourth and Fourteenth Amendment rights, and under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101 *et seq.*, for certain state-law torts committed against L.M.

11.     A central promise of our justice system is that people like L.M. are entitled to be made whole when government agents fecklessly strip them of their rights, their liberty, their property, their security, and their dignity. As Justice Kavanaugh recently observed in a concurrence, "the Fourth Amendment prohibits such action" by law-enforcement officers, and "remedies should be available in federal court." *Noem v. Vasquez Perdomo*, 606 U.S. __ (slip op. at 9) (Sept. 8, 2025).

JURISDICTION

12.     Plaintiffs Amber and Nathan Miller, on L.M.'s behalf, bring this case under the Fourth and Fourteenth Amendments to the Constitution of the United States; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101 *et seq.*

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1367, because the Millers assert claims under federal laws and their state-law claims arise from the same underlying events.

14.     Venue is proper in this Court under 28 U.S.C. §§ 99, 1391(b)(2), because the events giving rise to this action occurred in South Portland and Portland, Maine, which are in Cumberland County.

## PARTIES

15.    Plaintiffs Amber and Nathan Miller, and their son L.M., are citizens of the United States.

16.    Amber and Nathan Miller are the legal parents and guardians of L.M., a minor.

17.    When the underlying events occurred, Mr. and Mrs. Miller and L.M. resided in Portland, Maine. They continue to reside there.

18.    Defendants Portland and South Portland, Maine, are municipalities in Cumberland County.

19.    Defendant Daniel Ahern is, and was at the time of the underlying events, the South Portland Chief of Police. He is sued in his official capacity.

20.    Defendant Lieutenant Ben Macisso is, and was at the time of the underlying events, the Special Weapons and Tactics (SWAT) Commander for Portland and South Portland, as well as a South Portland employee and police officer. He is sued in his individual and official capacities.

21.    Defendants Sergeant Jake Hall, Detective Lieutenant Chris Todd, Detective Jonathan Stearns, Officer Caleb Gray, and Officer Anthony Verville are, or were at the time of the underlying events, South Portland employees and police officers who participated in the seizure and search of L.M. They are sued in their individual capacities.

22.    John Doe Officers are, or were at the time of the underlying events, Portland or South Portland employees and police officers who participated in the seizure and search of L.M. They include two Portland police officers. They are sued in their individual capacities.[1]

---

[1] Mr. and Mrs. Miller have tried to learn the unknown defendants' identities through public records requests to Portland and South Portland. The government entities have not disclosed the officers' identities.

## FACTUAL ALLEGATIONS

### A. Law-enforcement officers suspect Miles Hibbard of taking shoes and cologne from a house during a party.

23.    In May 2025, South Portland police officers were investigating the alleged disappearance of several pairs of shoes and bottles of cologne from a house during a party there.

24.    The alleged criminal activity happened on or about April 11, 2025.

25.    The officers knew that no weapon had been used in the alleged taking of property.

26.    The officers lacked probable cause to believe that the perpetrator had committed robbery.

27.    They had probable cause to believe he had committed only burglary and theft.

28.    As of May 13, 2025, the officers had four suspects for these crimes.

29.    One of those suspects was Miles Hibbard.

30.    Hibbard was not suspected of any other crimes.

31.    The officers lacked probable cause to suspect Hibbard of other crimes.

32.    Hibbard had been at the house party on or about April 11, 2025.

33.    On information and belief, Hibbard was not alleged to have been seen taking any property from the house.

34.    Hibbard had no history of crime or juvenile delinquency.

35.    The officers knew Hibbard had no such history.

36.    Hibbard also had no history of possessing a weapon, of violence, or of hostility toward police.

37.    The officers knew that Hibbard had no known history of possessing a weapon, of violence, or of hostility toward police.

38.    The officers knew, based on information from Hibbard's state identification

card or other sources, that Hibbard:

      a.  was nineteen years old;

      b.  was about 5'8";

      c.  was approximately 150 pounds;

      d.  had short hair, cut close to his head, as of a photo taken in April 2025 that officers had;

      e.  had brown skin, eyes, and hair;

      f.  lived at a certain residence in a neighborhood adjacent to Deering High School; and

      g.  had a large, prominent tattoo on one of his forearms.

39.    On information and belief, the officers knew that Hibbard was not a student at Deering High School.

40.    The officers had a recent photo of Hibbard's face, from a state identification card issued in April 2025.

41.    The officers should have known that Hibbard worked weekdays at an elder care facility in Cape Elizabeth, Maine.

42.    The officers applied for a warrant to search Hibbard's residence for evidence of robbery.

43.    The officers were informed that they lacked a sufficient factual and legal basis to obtain a warrant based on alleged robbery; they could obtain a warrant based on burglary and/or theft, only.

44.    Hibbard was thus suspected only of burglary, as a class B crime only because the location was a dwelling; and of theft by unauthorized taking or transfer, a class E crime (misdemeanor).

45.    On information and belief, Detective Jonathan Stearns applied for a warrant to search Hibbard's residence and person.

46.    The officers obtained a warrant to search Hibbard's residence and person

7

for certain pairs of shoes and certain cologne that were allegedly stolen.

47.     On information and belief, the officers also obtained a warrant to arrest Hibbard for burglary and/or theft, only.

**B. The officers prepare for a SWAT raid by Deering High School.**

48.     South Portland had and has formal, written policies that:

    a.  before serving any warrant, police officers must conduct a risk/threat assessment unless exigent circumstances exist to immediately serve the warrant;

    b.  any pre-planned felony arrest should also have a risk/threat assessment performed before the arrest if possible;

    c.  copies of all completed risk/threat assessments shall be given to and reviewed by a SWAT supervisor before warrant service and within 24 hours of serving it, and shall be accompanied by the warrant, any affidavits or reports, and any other information used in completing the assessment; and

    d.  each threat assessment is to be reviewed by an approving supervisor and the SWAT Supervisor.

49.     Since 2009, South Portland has had a partnership with Scarborough and Cape Elizabeth to form and maintain the Southern Maine Regional SWAT Team.

50.     A memorandum of understanding dated July 17, 2023, and signed by South Portland City Manager Scott Morelli (along with others, including the town managers for Scarborough and Cape Elizabeth) reflects policies of the participating municipalities concerning use of the SWAT Team.

51.     The memorandum states that the municipalities have authorized their respective police chiefs to annually renew the agreement until that authorization is revoked.

52.    The memorandum also states that all SWAT Team equipment is owned and maintained by the purchasing municipality.

53.    The Southern Maine Regional SWAT Team is made up of officers from each of the three partner municipalities.

54.    Part of the agreement among the three municipalities is that any warrant authorizing entry into a private premise should have a threat assessment completed and the recommendations of the assessment should be followed.

55.    South Portland officers on the Southern Maine Regional SWAT Team include (and included as of May 13, 2025) Ben Macisso, Jonathan Stearns, Anthony Verville, Jake Hall, Caleb Gray, Ryan Lathrop, Sidney Stewart, and Pierce Harrer.

56.    The Southern Maine Regional SWAT Team uses military-style vehicles, weapons, armor, other equipment, and tactics.

57.    On information and belief, even when the Southern Maine Regional SWAT Team is not deployed, South Portland officers may and sometimes do use SWAT equipment and tactics.

58.    South Portland's budget for SWAT equipment and training has dramatically increased in the past few years.

59.    From 2013 through approximately 2024, the city's budget for SWAT equipment and/or training increased modestly from $3,450 to $9,500.

60.    From approximately 2024 through 2025, the city's budget for SWAT equipment and/or training jumped from $9,500 to $59,500.

61.    To determine the level of SWAT equipment and tactics to be used (including the number of personnel), South Portland uses a standard threat assessment.

62.    That threat assessment involves the completion of a form containing a point-based matrix.

63.    The form lists 25 possible factual circumstances.

64.    Points are assigned to each circumstance.

65.    To indicate whether a circumstance exists, officers check a "yes" or "no" box.

66.    The points are totaled for an overall threat-assessment score.

67.    1–15 points is "low risk"; SWAT response is optional.

68.    16–25 points is "medium risk," requiring consultation with the SWAT Commander (Lt. Macisso).

69.    26+ points is "high risk"; officers must request SWAT activation.

70.    On information and belief, under South Portland policies, officers may indicate that a threatening circumstance (that is, a basis for adding points to the threat assessment) exists when officers lack probable cause to believe it does.

71.    On information and belief, it is a South Portland policy that officers may and should specify that a threatening circumstance exists when officers have even unreliable information (for example, a rumor or mere association with another person) that a threatening circumstance exists.

72.    On information and belief, it is a South Portland policy that officers may and should specify that a threatening circumstance exists when officers have any basis—no matter how small—to speculate or believe that a threatening circumstance exists.

73.    On information or belief, at least two times in the past (on or about July 9, 2024, and April 12, 2023), South Portland officers falsely indicated in threat assessments that certain threatening circumstances existed.

74.    In those instances, South Portland officers indicated that certain threatening circumstances existed without probable cause or reliable bases for such a belief.

75.    On information and belief, it is South Portland policy for officers to use SWAT equipment and tactics when an officer indicates in a threat assessment that a suspect may have a weapon.

76.    The investigating South Portland police officers here followed city policies

in conducting a threat assessment before serving the warrant(s).

77.    One or more officers completed a threat assessment that produced a "medium risk" score, requiring consultation with the SWAT Commander, Lt. Macisso.

78.    On information and belief, the officer(s) who conducted the threat assessment followed South Portland policies and practices in exaggerating the threat—indicating the existence of threatening circumstances that did not exist and when the officers lacked probable cause to believe they existed.

79.    On information and belief, the officer(s) who conducted the threat assessment indicated, falsely and without probable cause or a reliable basis, that:

    a.  Hibbard was known to carry or display firearms,

    b.  Hibbard had used firearms in the commission of crimes, and/or

    c.  firearms were believed to be present at the target location.

80.    Had the officer(s) conducting the threat assessment indicated only the circumstances for which they had a reliable basis or probable cause, the risk-assessment matrix would have produced a "low risk" score.

81.    On information and belief, officers reached a "medium risk" score based on the officers' suspected association, alone, of Hibbard with one or more persons suspected of possessing or using a gun.

82.    The officers lacked probable cause to believe:

    a.  that the warrant(s) were for drug crimes, crimes against a person, or felony crimes of violence;

    b.  that Hibbard had any criminal history;

    c.  that firearms would be present at the house or on Hibbard; or

    d.  that ammunition would be present at the house or on Hibbard.

83.    Hibbard was not known to carry or display firearms.

84.    Hibbard had never used firearms to commit crimes.

85.    Hibbard had no history of violence or resistance toward police.

11

86.    Hibbard had made no statements indicating resistance to service.

87.    Hibbard's house had only a Mini Bernedoodle living there.

88.    Mini Bernedoodles are a cross between a Bernese Mountain Dog and a Miniature Poodle.

89.    They are known for their gentle, affectionate nature.

90.    No guard dog or other dog for protection lived at the residence.

91.    Hibbard's house was not heavily fortified or booby trapped.

92.    Hibbard lived in the house with three other people.

93.    None of those individuals were suspected of any crime or violence.

94.    Executing the warrant did not require breaching tools or forced entry.

95.    Although the presence of ammunition at a target location is not a threatening circumstance listed in the threat-assessment matrix, the officers here used speculation about ammunition at Hibbard's residence as a reason to deploy SWAT equipment and tactics.

96.    The officers lacked probable cause or a reliable basis to believe that ammunition would be at Hibbard's residence.

97.    South Portland officers consulted SWAT Commander Lt. Macisso.

98.    As SWAT Commander, Lt. Macisso was the final policymaker for South Portland and Portland for the decision to use SWAT equipment and techniques in the execution of the warrant(s) on Hibbard and his residence.

99.    South Portland officers consulted with Lt. Macisso, who authorized and directed the use of SWAT equipment and tactics to execute the warrant(s) on Hibbard and his residence.

100.    On information and belief, even without a final policymaker's direction, it was South Portland's policy to execute these kinds of warrants using between 6 and 15 officers, assault rifles, and other military-style equipment, and to treat the suspect as if he were a dangerous, violent person who possesses a firearm.

12

101.   On information and belief, Lt. Macisso authorized and directed the sending of between 6 and 20 police officers from the South Portland and Portland police departments to Hibbard's home, with many of the officers carrying assault rifles and wearing heavy protective gear.

102.   On information and belief, Lt. Macisso authorized and directed the recruitment of officers from the City of Portland to join the operation.

103.   On information and belief, the City of Portland maintains a policy to assist neighboring police departments, including South Portland, in the execution of warrants in Portland.

104.   On information and belief, it is a policy of the City of Portland, when its officers help other departments execute warrants, to follow the orders of officers from the neighboring police department, which leads the operation.

105.   Here, the officers who were recruited from Portland for the execution of the warrant(s) implemented this Portland policy, following the orders and example of South Portland officers.

106.   At first, the officers who were participating in the operation planned to execute the warrant(s) sometime between 8 and 9 a.m. at Hibbard's residence.

107.   But the officers recognized that they were planning to execute the warrant(s) very close to Deering High School and that many students would likely be traveling to school in the immediate area at that time.

108.   So they decided to wait a few hours to execute the warrant(s).

109.   After all, no exigent circumstances required immediate warrant execution.

110.   No officers notified Deering High School about a planned police operation near the school.

111.   Nor did Deering High School's administrators or other staff otherwise receive any advance notice about the operation.

112.   Had Deering High School been notified, the school would likely have put

the school on lockdown or prohibited students from leaving campus during the operation.

113. As one spokesperson for the school district confirmed, when the school receives notice of such activity, the administrators "put in place safety measures to keep students and staff safe."

114. The officers, including Lt. Macisso, knew or should have known that Deering High School has an open-campus policy that allows its students to go off campus for lunch.

115. One officer who participated in the operation to execute the warrant(s) was or had been a school resource officer.

116. The officers, including Lt. Macisso, also should have known that on May 13, 2025, when they planned to execute the warrant(s), Deering High School would release its students for lunch at about 11:00 a.m.

117. The school lunch schedule was posted publicly online.

118. The officers, including Lt. Macisso, also should have known that:

    a. Deering High School's student population is almost 900;

    b. nearly all students at Deering High School go off campus for lunch;

    c. approximately one quarter of the school's student population matched the basic description of Hibbard—male teen with brown skin and hair.

119. Deering High School publicly claims to be "the most diverse high school north of Boston."

120. Demographic information about the school is publicly available online.

121. About half of the student population is male.

122. More than half of the student population is ethnically non-white.

123. School yearbook photos confirm that approximately a quarter of the student population are male teens with brown skin and hair.

124. The police operation near Deering High School was led primarily by SWAT

Commander Lt. Macisso, assisted by Jonathan Stearns.

**C. Officers seize L.M. at gunpoint.**

125.    At about 11:00 a.m., the team of officers drove multiple vehicles toward Hibbard's house.

126.    The vehicles included at least four SUVs, at least one (the lead vehicle) of which was marked with "Police South Portland."

127.    Hibbard's residence was a house (circled on the map below) that is less than one block away from Deering High School:



128.    The officers all knew that Hibbard's home was less than a block away from Deering High School.

129.    The house was about 375 feet away from the school grounds.

130.    Between the house and Deering High School were a driving school, a public library, and at least four other houses.

131.    Next to Deering High School was an elementary school, and down the street were a church, middle school, various businesses, and homes.

132.    The middle school, church, elementary school, and various businesses and homes were all less than half a mile away from Hibbard's residence, where the officers planned to execute the warrants with SWAT equipment and tactics.

133.    The officers drove south on Stevens Avenue, passing these establishments.

134.    The officers could see that kids at the elementary school were playing on the playground next to the street, just north of Deering High School.

135.    The officers saw that people were walking and jogging on the sidewalks.

136.    The officers saw at least three black teens walking away from Deering High School toward Orkney and Stevens Streets.

137.    The officers knew or should have known that Deering High School students frequently walk on the sidewalks in the neighborhood adjacent to the school, including along Orkney Street, on which Hibbard's residence sat.

138.    The officers knew or should have known that Deering High School students park their cars in the neighborhood adjacent to the school, including along Orkney Street.

139.    Orkney Street spans one block approximately 570 feet long.

140.    Orkney Street is lined on both sides by houses, totaling at least 13.

141.    Hundreds of other houses surrounded Hibbard's residence in the same neighborhood, in close proximity.

142.    The officers did not need to use SWAT equipment and tactics to safely apprehend Hibbard.

143.    Sending officers armed with assault rifles to a residential neighborhood in close proximity to multiple schools was dangerous.

144.    By using SWAT equipment and tactics, the cities and their officers increased the risk that innocent people would get hurt.

145.    The lead police vehicle turned onto Orkney Street.

146.    The street was a calm, peaceful scene, and it gave the officers no signs that

16

Hibbard was home.

147.    Within a few seconds of turning onto Orkney Street, the officers saw L.M. walking on the sidewalk away from the school, between the school and Hibbard's residence.

148.    L.M. was less than half a block away from the school.

149.    L.M. and a group of his friends (most of them also male teenagers with brown skin and hair) had been released from Deering High School for lunch.

150.    They had planned to go to McDonald's for food.

151.    One of L.M.'s friends had parked his car (a blue car) on Orkney Street, between Hibbard's residence and the school.

152.    The group of friends had walked to the car after being released from school for lunch, and they were getting ready to drive to McDonald's.

153.    The police officers had not associated L.M.'s friend's car or any other blue car with Hibbard.

154.    The officers had no reason to believe that Hibbard was associated with that car or another blue car like it.

155.    At least six other vehicles were parallel parked on the same street (Orkney).

156.    One of those vehicles (a white vehicle) was almost directly in front of Hibbard's residence, parked on the same side of the street as the house.

157.    Another vehicle (a red car) was parked behind L.M.'s friend's car, closer to Hibbard's residence.

158.    Between the white and red vehicles was open space along the curb on the same side of Orkney Street as Hibbard's residence.

159.    Also between the white and red vehicles was a long driveway leading to two garages between Hibbard's residence and another house.

160.    No vehicles were parked on that driveway.

161.    When the police officers turned onto Orkney Street, L.M.'s friends had

already gotten into the car (the blue one) closer to the school.

162.  L.M. was on the sidewalk, waiting for his friends to make room for him.

163.  The officers turned onto Orkney Street at that time.

164.  The officers saw L.M. from behind, only.

165.  He had much longer hair than the suspect—brown hair that framed his face—and brown skin.

166.  He was 3 years younger, about 4 inches taller, and about 30 pounds heavier than Hibbard.

167.  L.M. was wearing a short-sleeved white T-shirt, exposing his tattoo-free arms.

168.  He had only his cell phone in his hand.

169.  He was not in front of or coming from Hibbard's residence.

170.  He was in front of a different house closer to the school.

171.  Hibbard's house was nearly 100 feet away from L.M.

172.  The officers decided to seize him for no reason other than the possibility that he was Hibbard.

173.  They activated the emergency lights on their vehicles, exited, aimed assault rifles at him, and told him to stop.

174.  L.M. turned around and stopped moving.

175.  About half a dozen officers kept guns aimed at him, including at least three assault rifles.

176.  L.M. was terrified and confused.

177.  An officer ordered him to put his hands up.

178.  L.M. asked if the officer had issued the order to him.

179.  The officer confirmed that he had.

180.  L.M. put his hands up, lifting his exposed forearms in the air.

181.  When L.M. turned around and saw the officers, their vehicles, and guns, he

did not run or otherwise make suspicious movements.

182.   One set of officers had stopped a police vehicle next to L.M.'s friend's car.

183.   Another police vehicle had stopped closer to the school, boxing in the car at the curb.

184.   L.M.'s friend's car was parked in front of a residence that was not Hibbard's.

185.   The officers could see that the car had people in it.

186.   Officers called L.M. "Miles" (Hibbard's first name).

187.   L.M.'s friends in the car yelled to the officers that L.M. wasn't Miles.

188.   The officers could hear L.M.'s friends saying this; the friends spoke loudly, and one of the car doors was open.

189.   At least one officer aimed a gun toward the vehicle and ordered the friends to close the door.

190.   The boys in the car complied, closing the door.

191.   Although the officers by now saw L.M.'s face, hair, body, and tattoo-free arms, and had been told that L.M.'s name was not Miles, they kept him detained as Hibbard.

192.   At this moment, they knew or should have known that L.M. was not Hibbard.

193.   The officers had no other reason to detain L.M.

194.   Still, an officer ordered L.M. to walk toward him, keeping his hands up.

195.   L.M. calmly and immediately complied.

196.   An officer ordered L.M. to walk into the street and to stand at the back of a police vehicle, facing away from the officers (who held weapons and wore protective gear).

197.   L.M. complied with every command calmly and immediately.

198.   At this point, L.M.'s arms were up in the air and exposed to at least six officers who stood facing him.

199.    Those officers ranged from inches away from L.M. to a few yards away from him.

200.    Each of those officers knew then that L.M. had no large tattoos on his arms.

201.    The officers knew then that L.M. was not the suspect.

202.    An officer ordered him to kneel. L.M. did.

203.    An officer ordered him to lie flat on the ground.

204.    L.M. complied while also asking, "What did I do?"

205.    No officer answered him.

206.    One officer ordered him: "Hands behind your back. Don't move."

207.    L.M. complied.

208.    Two officers descended upon him, with one putting a knee on his back as they prepared to cuff L.M.'s hands.

209.    Detective Jonathan Stearns walked close to where L.M. was lying on the ground with his hands behind his back, while two officers held him in place.

210.    By this point, any possible doubt about whether L.M. was Hibbard evaporated; the officers knew that L.M. was not Hibbard.

211.    The officers could no longer ignore the fact that L.M.'s arms had no tattoos, much less a large prominent one.

212.    Police Chief Ahern would later confirm that the officers knew when they put the handcuffs on that they had gotten "the wrong guy."

213.    But, as Chief Ahern would also later confirm, under city policies, the officers were going to keep L.M. detained tattoo or no tattoo—regardless of whether the officers knew he was not the suspect; the policy and practice was to keep a person detained in this situation until after the officers secured the person in handcuffs and learned the person's true identity.

**D. Knowing that L.M. was not a suspect, officers keep him seized, question him, and search him.**

214.   The officers knew as they prepared to handcuff L.M. that he was not Hibbard.

215.   The officers did not suspect L.M. of any crime and had no articulable basis to suspect him of a crime.

216.   Still, the officers did not let L.M. go.

217.   They cuffed L.M.'s hands behind his back.

218.   On information and belief, at this time, Det. Stearns stated that "it's not Hibbard whom they had handcuffed.

219.   Then the officers got L.M. to his feet, with his hands still cuffed behind his back, and walked him closer to the school, keeping their hands on him.

220.   L.M. again asked, "What did I do?"

221.   An officer told L.M. to hang on; they would explain everything.

222.   On information and belief, a Defendant police officer from the Portland Police Department commented to another officer, "I don't love this."

223.   Instead of explaining everything to L.M., an officer asked L.M. if he had anything on him.

224.   L.M. responded, "No, sir. Just my ear pods."

225.   The officers had no reason to believe L.M. was lying.

226.   The officers had no reason to believe L.M. was armed or dangerous, much less both.

227.   Still, an officer frisked L.M.

228.   The officer found no weapons or anything else suspicious.

229.   The officers still did not let L.M. go.

230.   They instead asked him a series of questions—for example, about the car his friends were in and about where he lives and goes to school.

231.   None of his answers suggested that he was Hibbard, that any of his friends in the car were Hibbard, or that he or his friends were involved in criminal activity.

232.   By this time, more students had gathered between the police and the school, watching the commotion.

233.   Many of them, too, were teenage boys with brown hair and skin.

234.   By this time, the officers knew that L.M. was among the Deering High School students who had been released from campus.

235.   The officers talked among themselves about where Hibbard might be, since L.M. was not him.

236.   L.M. heard the officers talking to each other about having detained the wrong person because L.M. was not Hibbard.

237.   Still, the officers kept L.M. detained in handcuffs.

238.   At least one male student (also with brown skin and brown hair) stood close by on the south side of Orkney Street.

239.   The officers did not seize or question that student.

240.   At least two other people were inside a car parked on Orkney Street next to where the officers were questioning L.M. in handcuffs.

241.   The officers could see that people were in that car, through its windows.

242.   On information and belief, no officers seized or questioned those people.

243.   During L.M.'s seizure, a pedestrian (a man) who was directly across the street from Hibbard's residence walked toward Hibbard's residence.

244.   The man was visible to the officers and was closer to Hibbard's residence than L.M. and his friends had been when the officers seized L.M.

245.   The man then turned toward the officers, walked a few steps on the sidewalk, and walked up steps to the porch of a house facing Hibbard's residence.

246.   That house was almost directly in front of Hibbard's residence, on the opposite side of Orkney Street.

22

247.   No officers detained that person, who remained on the porch, watching at least some of the incident and recording it with a cell phone, during L.M.'s detention.

248.   On information and belief, no officer detained that person even after L.M. was released and the officers executed the search warrant at Hibbard's residence.

249.   At least one other person recorded some of the police activity from a location between where the officers held L.M. in handcuffs and Hibbard's residence.

250.   No officers seized that person, either.

251.   The officers asked L.M.'s friends, who were in the car, for IDs and if any of them were Hibbard.

252.   The students cooperated, showed that they were not Hibbard, and explained that L.M. is not Hibbard, either.

253.   An officer confirmed, "Yeah, we know."

254.   The officers looked at the students' IDs and said, "You guys are good" and "we're going to move our cars out of the way and you guys are all set."

255.   The officers walked L.M., still handcuffed, to the south side of Orkney Street, and took off the handcuffs.

256.   The officers still ordered L.M. not to leave and to instead sit on the curb, where officers asked him more questions.

257.   For example, although L.M. had already told the officers his name and where he goes to school, they asked him again what is name is, how old he is, and where he goes to school.

258.   L.M.'s friends, who had gotten out of the car rather than wait to drive away, joined the crowd of students that had formed.

259.   Later, officers released L.M.

260.   No officer tried to release L.M. sooner.

261.   On information and belief, no officer said to another officer on the scene that L.M. should have been released upon the officers realizing that L.M. was not the

suspect.

262.    On information and belief, in the context of deploying the level of SWAT equipment and tactics deployed here to execute a warrant or when officers executing a warrant speculate that the suspect may have a weapon, Portland and South Portland have, and had, policies that:

  a.  officers may and should seize at gunpoint persons believed to be a suspect;

  b.  officers may and should seize individuals near the target location based on a vague resemblance to a suspect;

  c.  officers may and should seize individuals who apparently match a suspect's gender, basic age, and general skin and hair color;

  d.  officers may and should seize individuals as the suspect before seeing the detainees' faces when the individuals are near the target location and match a suspect's gender, basic age, and general skin and hair color;

  e.  officers may and should keep detaining an individual who was mistakenly seized as a suspect after the officers realize the detainee is the wrong person, until that person has been secured in handcuffs and identified;

  f.  officers need not and should not immediately release an individual who was mistakenly seized as a suspect once officers realize the detainee is the wrong person and do not suspect him of a different crime;

  g.  once officers detain a person believed to be a suspect, officers should handcuff him, regardless of whether the officers realize before the handcuffing that he is not the suspect;

  h.  once officers detain a person believed to be a suspect, officers should frisk him, regardless of whether the officers realize before the frisk that he is not the suspect and regardless of whether the officers have

reasonable, articulable suspicion that the person is presently armed and dangerous;

i.  once officers detain a person believed to be a suspect, officers should keep him detained to question him, regardless of whether the officers realize before the questioning that he is not the suspect and regardless of whether the officers reasonably suspect him of another crime.

263.  On information and belief, the officers were trained to do or not do the following in the context of an operation deploying the level of SWAT equipment and tactics used here or when officers executing a warrant speculate that the suspect may have a weapon:

a.  do use the threat of deadly force when seizing individuals as a suspect;

b.  do seize individuals near the target location based on a vague resemblance to a suspect;

c.  do seize individuals who apparently match a suspect's gender, basic age, and general skin and hair color;

d.  do seize individuals as a suspect before seeing the detainees' faces when the individuals are near the target location and match a suspect's gender, basic age, and general skin and hair color;

e.  do keep detaining an individual who was mistakenly seized as a suspect after the officers realize the detainee is the wrong person, until that person has been secured in handcuffs and identified;

f.  do not immediately release an individual who was mistakenly seized as a suspect once the officers realize the detainee is the wrong person and do not suspect him of a different crime;

g.  do, after detaining a person believed to be a suspect, handcuff the detainee, regardless of whether the officers realize before the handcuffing that he is not the suspect and regardless of whether the

officers suspect him of a different crime;

h.   do, after detaining a person believed to be a suspect, frisk the detainee, regardless of whether the officers realize before the frisk that he is not the suspect and regardless of whether the officers have reasonable, articulable suspicion that the person is presently armed and dangerous;

i.   do, after detaining a person believed to be a suspect, keep him detained for questioning, regardless of whether the officers realize before the questioning that he is not the suspect and regardless of whether the officers reasonably suspect him of another crime.

264.   L.M. was in handcuffs for minutes in front of his peers.

265.   L.M. and his friends abandoned their plans to go to McDonald's and instead went back to school.

266.   Witnesses to the incident recorded parts of the encounter on cell phones.

267.   Some of those records have been shared with others who were not witnesses.

268.   As a result of the cities' and officers' conduct, witnesses and people who have seen footage, records, or stories about the incident have believed (wrongly) that L.M. engaged in serious criminal activity warranting the officers' treatment of him like a violent criminal.

269.   Throughout the entire encounter, L.M. was outwardly calm, compliant, respectful, and cooperative.

270.   Police Chief Ahern would later confirm that L.M. did everything right when responding to the officers and circumstances he faced.

271.   L.M. had done nothing suspicious.

272.   He was seized only because he was a teenaged male with brown skin and hair, walking on a sidewalk down the street from where officers planned to execute a warrant for a nonviolent crime by a nonviolent suspect.

273.   L.M.'s friends likewise did nothing suspicious and acted uprightly, cooperatively, respectfully, and calmly during the encounter.

274.   Neither L.M.'s conduct nor his friends' conduct gave the officers any reason to fear that L.M. or his friends were armed or dangerous.

### E. The officers execute the warrant(s) at Hibbard's residence and workplace, and Hibbard is soon after released.

275.   The officers next executed the search warrant at Hibbard's residence.

276.   Two of Hibbard's family members were home, along with the Mini Bernedoodle.

277.   As officers with assault rifles surrounded Hibbard's residence, at least one officer saw the Bernedoodle outside, behind mesh or wire fencing in the back yard, wagging its tail.

278.   No officers viewed that dog as a true threat or danger.

279.   One officer stood near the dog and gave the dog a friendly wave.

280.   Hibbard was at work, as usual midday on a Tuesday, at an elder care facility in Cape Elizabeth.

281.   Detective Jonathan Stearns spoke on the phone with Hibbard's mother, who said she could bring Hibbard to the station.

282.   That cooperative plan involving no weapons was rejected by the officers.

283.   Instead, three heavily armed officers were sent to the elder care facility that day.

284.   Searching Hibbard's residence, the officers did not find any of the shoes or cologne, or any other evidence of the alleged criminal activity.

285.   Still, they took a different pair of shoes that belonged to Hibbard.

286.   The officers also found no firearms or ammunition, or evidence of either, at the house.

287.   Bringing their large guns to the elder care facility, officers arrested Hibbard

there.

288.   Hibbard cooperated and went peacefully.

289.   He was released within a few hours, by 4:00 p.m., on a $500 bond.

290.   On information and belief, he was charged with the nonviolent and weaponless crimes of burglary and theft, and his criminal prosecution was resolved by a filing agreement that is expected to result in a full dismissal.

**F. The police chief confirms that the officers executed city policies.**

291.   After the incident, the City of South Portland and Police Chief Ahern made statements about it.

292.   The City of South Portland issued a news release stating that the officers "had guns drawn" when seizing L.M. and keeping him detained because it was "standard procedure" under the circumstances.

293.   Chief Ahern stated that he believed the officers "acted reasonably and appropriately given the circumstances and information they had at the time."

294.   He also stated that conducting a risk/threat assessment was "policy."

295.   He added that the assessment score classified the operation as not high risk but requiring consultation with SWAT Commander, Lt. Macisso.

296.   He explained that the operation plan that was formed included reaching out to the Portland Police Department for assistance.

297.   He also stated that the time for the warrant service was originally scheduled for 8:30 a.m., but changed because officers thought there would be potential for more students traveling to school in the area around that time.

298.   He also stated that Officer Verville, a member of the Southern Maine Regional SWAT Team, was operating the lead vehicle as they approached Hibbard's residence.

299.   He also stated that once officers ordered L.M. to lie on the ground, Det.

Stearns walked up to L.M. and "quickly determine[d]" L.M. was not Hibbard and was instead a student on lunch break from Deering High School.

300.    He also stated that "School Resource Officer (SRO) Caleb Gray, also a member of the SWAT team," was the officer to escort L.M. closer to the school and uncuff him.

301.    He also stated that he did not believe the officers would do anything differently if they were to encounter the same circumstances again.

302.    He stated that the officers did everything according to department policies and as they were trained to do.

303.    He stated that he was proud of the way the officers handled L.M. and that he was confident no policies were violated and that officers acted according to best practices.

304.    He also described the incident by saying that the officers acted "appropriately" when engaging with L.M.

305.    He justified the officers' conduct by explaining that the suspect was known to associate with individuals who allegedly possess firearms and use them to commit crimes.

306.    In other words, Chief Ahern confirmed that it is policy for officers investigating a person believed to associate with people who possess or use firearms to:

  a.  seize at gunpoint individuals believed to be that person;

  b.  keep such individuals detained, even after the officers have realized the detainees are not the suspect and when the officers have no reasonable suspicion that the detainees are otherwise engaged in criminal activity, until after the detainees have been placed in handcuffs and identified;

  c.  handcuff such individuals, regardless of whether officers know that the detainees are not the suspect;

   d. frisk such individuals, regardless of whether officers know that the
      detainees are not the suspect and regardless of whether the officers have
      reasonable suspicion to believe the detainees are presently armed and
      dangerous;

   e. question such individuals to learn their true identities, regardless of
      whether the officers know that the detainees are not the suspect and
      regardless of whether the officers have reasonable suspicion to believe
      the detainees are presently armed and dangerous.

307. The City of South Portland stated that the South Portland Police
Department would be further reviewing the incident to ensure that all policies,
protocols, and procedures were followed.

308. On information and belief, Chief Ahern made that determination.

309. Chief Ahern, after reviewing the incident further, concluded that the
officers' conduct complied with and implemented city policies.

310. Chief Ahern stated that the officers knew, going into the operation, that
the suspect had an arm tattoo.

311. Chief Ahern also explained that the tattoo was how the officers knew, as
they were about to handcuff L.M., that he was not the suspect.

312. He also stated that the detention of L.M. after officers knew he had no
tattoo (and thus was not the suspect) was department policy; in situations like this,
he explained, the officers are going to secure the person and identify who he is, tattoo
or no tattoo.

313. Under that policy, Chief Ahern indicated, a person who is seized as a
suspect—even if officers discover their error in misidentifying him and have no other
reason to suspect him of criminal activity—will be secured in handcuffs and
questioned.

314. Another South Portland police officer, who reviewed footage of the incident

with Chief Ahern, confirmed that the policy and practice is to continue seizing a detainee even after the officers know that he is not the suspect: in that officer's words, the detaining officers are not going to "stop halfway through" by releasing a person once they learn he is not the suspect; they will instead take that person into custody, regardless of whether they realize it's the wrong person.

315.    Reviewing video footage of the incident, Chief Ahern stated that he believed the police officers in the footage did everything right.

316.    He indicated that, given that the officers were seeking Hibbard, it was appropriate for the officers to detain L.M. in the way and as long as the officers did.

317.    Chief Ahern stated that the officers should have known that students at Deering High School frequent the neighborhood where the officers planned to execute the warrants, and that Deering High School students park their cars along Orkney Street.

318.    He also stated that probably a lot of students at Deering High School match the basic description of Hibbard.

319.    On information and belief, to the extent city policies do not otherwise cover South Portland police officers' training and execution of warrants, Chief Ahern is South Portland's final policymaker for certain policies concerning South Portland police officers' training and execution of warrants.

320.    All individual Defendants were operating within the scope of their employment.

321.    On January 16, 2026, Plaintiffs submitted notices of claim to the relevant Portland and South Portland city officials.

### INJURIES TO L.M.

322.    L.M. suffered deprivations of his Fourth and Fourteenth Amendment rights to be secure in his person and effects.

323.   L.M. was traumatized, embarrassed, and humiliated during and after his seizure, and the trauma has been long lasting.

324.   L.M.'s continuing trauma, embarrassment, and humiliation come in part from his peers and others believing, based on the officers' actions, that he had engaged in serious criminal activity to warrant such treatment.

325.   L.M. experienced discomfort on his wrists from the handcuffs.

326.   Since the seizure, L.M. has lived in fear that law-enforcement officers in Portland and South Portland will again erroneously detain him at gunpoint, mistaking him for sought-after suspects.

CLAIMS

327.   Amber and Nathan Miller, on behalf of L.M., assert various claims based on Defendants' violations of L.M.'s Fourth and Fourteenth Amendment rights and Defendants' tortious conduct under Maine law.

**Count 1**

**42 U.S.C. § 1983:**
**Fourth and Fourteenth Amendment Violations**

**Unreasonable initial seizure**

***Brought against all Defendants.***

328.   Amber and Nathan Miller incorporate and reallege the allegations in paragraphs 1–326, above.

329.   42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourth and Fourteenth Amendments. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

330.  The Fourth Amendment (applicable to the states through the Fourteenth Amendment) protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

331.  An initial seizure of a person violates the Fourth and Fourteenth Amendments when the seizure is unsupported by reasonable suspicion that the person has committed a crime or is about to engage in criminal activity.

332.  An initial seizure of a person also violates the Fourth and Fourteenth Amendments when the seizure is performed in an unreasonable way, including by threatening deadly force against a person who is compliant, nonviolent, and whom the officers do not reasonably suspect is armed and dangerous.

333.  An initial seizure of a person also violates the Fourth and Fourteenth Amendments when the seizure is of a person whom officers know or should know is not a suspect.

334.  The individual Defendants violated L.M.'s Fourth and Fourteenth Amendment rights when they initially seized him, with threats of immediate death from about half a dozen officers who aimed large firearms at him.

335.  All the individual Defendants either personally seized L.M. or caused L.M. to be seized.

336.  All the individual Defendants either personally threatened L.M. with deadly force or otherwise caused L.M. to be threatened with deadly force when he was seized.

337.  The officers should have known that L.M. was not the suspect, Hibbard, from the start.

338.  The officers seized L.M. based solely on his presence within a block of the suspect's home, his gender, teen age, and basic coloring.

339.  Hundreds of students matching that same description had just been

released from Deering High School, less than a block (and less than 400 feet) away, and it is common for Deering High School students to park their cars on Orkney Street. The officers should have known as much.

340. Even if it would have been reasonable to seize L.M.—and it wasn't—the way in which L.M. was seized was unreasonable.

341. The officers were investigating nonviolent, weaponless criminal conduct—the taking of shoes and cologne.

342. Hibbard had no history of crime, violence, possession of weapons, hostility toward police, or noncompliance with police orders.

343. Officers carried out an operation using military-style weapons and tactics based solely on the speculation that Hibbard was associated with one or more people alleged to possess firearms or to use firearms to commit alleged crimes.

344. L.M. and his friends immediately and calmly complied with all the officers' orders.

345. L.M. and his friends showed no signs that they possessed weapons or would behave violently.

346. Still, upwards of half a dozen officers threatened L.M. with deadly force, aiming assault rifles at him while his hands were up.

347. The officers, in seizing L.M. and seizing him with such a show of force, were implementing the policies of Portland and South Portland.

348. As Chief Ahern confirmed, the officers were implementing the South Portland police department policies and their training.

349. It was city policy for the officers to conduct the threat assessment in the way that they did—overestimating the threat level based on threatening circumstances officers lacked probable cause to believe existed.

350. It was city policy for the officers to consult with SWAT Commander Lt. Macisso.

34

351.   It was city policy for the officers to use this level of SWAT equipment and tactics in an operation to execute warrants to search or arrest a person whom officers speculate may possess a weapon.

352.   It was city policy for the officers—when carrying out an operation with this level of SWAT equipment and tactics—to seize suspects under threat of deadly force.

353.   It was city policy for the officers—when carrying out an operation with this level of SWAT equipment and tactics—to seize individuals near the target location based on their vague resemblance to the suspect.

354.   It was city policy for the officers—when carrying out an operation with this level of SWAT equipment and tactics—to seize individuals near the target location if they apparently matched the suspect's gender, basic age, and general skin and hair color.

355.   It was city policy for the officers—when carrying out an operation with this level of SWAT equipment and tactics—to seize individuals near the target location as the suspect before seeing the detainees' faces.

356.   Each of these city policies directly resulted in the violation of L.M.'s rights in an unreasonable initial seizure.

357.   To the extent other city policies did not cover the officers' conduct here, Lt. Macisso was the South Portland final policymaker concerning how the warrants to search and/or arrest Hibbard would be carried out.

358.   To the extent Lt. Macisso was not the final policymaker for how the officers were to conduct themselves during the operation, Det. Jonathan Stearns was the final policymaker.

359.   The officers seized L.M. based only on his presence down the street from Hibbard's home and the similarity of only a few physical characteristics based on city policy to seize anyone, with threats of deadly force, who met those criteria.

360.   As a direct result of Defendants' Fourth and Fourteenth Amendment

violations, L.M. suffered injuries listed above.

### Count 2

**42 U.S.C. § 1983:**
**Fourth and Fourteenth Amendment Violations**

**Unreasonable prolonged seizure**

***Brought against all Defendants.***

361.   Amber and Nathan Miller incorporate and reallege the allegations in paragraphs 1–326, above.

362.   42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourth and Fourteenth Amendments. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

363.   The Fourth Amendment (applicable to the states through the Fourteenth Amendment) protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

364.   A seizure is unreasonably prolonged when officers fail to release a detainee when the basis for the initial seizure ceases to exist and officers lack reasonable suspicion to believe the detainee is involved in another crime.

365.   The officers should have known that L.M. was not Hibbard when L.M. was on the sidewalk, with his tattoo-less arms exposed and raised, and when the officers saw his face, hair much longer than Hibbard's recent photo, and L.M.'s size.

366.   The officers knew that L.M. was not Hibbard by the time L.M. lay on the ground in the street with his arms behind his back.

367.    After the officers knew that L.M. was not Hibbard, they lacked reasonable suspicion that L.M. had committed or was about to commit a crime.

368.    But the officers did not let L.M. go.

369.    Instead, they handcuffed him, kept him handcuffed for minutes in front of his peers, walked him toward the school, questioned him, frisked him, walked him to a curb still handcuffed, took the handcuffs off but kept him detained, and questioned him more.

370.    The identities of all the individual Defendants who continued to detain L.M. are not yet known.

371.    No officer tried to release L.M. sooner.

372.    The officers were implementing city policies by continuing to detain L.M. after the officers knew he was not the suspect and had no reason to believe L.M. had committed or was going to commit a crime.

373.    Lt. Macisso and Jonathan Stearns, who oversaw the operation, endorsed the prolonged detention on the scene, observing it and allowing it to continue.

374.    Chief Ahern also later endorsed the prolonged detention as driven by city policies and the officers' training.

375.    As a direct result of Defendants' Fourth and Fourteenth Amendment violations, L.M. suffered injuries listed above.

### Count 3

**42 U.S.C. § 1983:**
**Fourth and Fourteenth Amendment Violations**

**Unreasonable search**

***Brought against all Defendants.***

376.    Amber and Nathan Miller incorporate and reallege the allegations in paragraphs 1–326, above.

377.  42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourth and Fourteenth Amendments. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

378.  The Fourth Amendment (applicable to the states through the Fourteenth Amendment) protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

379.  A frisk is unreasonable when officers lack an articulable basis to believe the person searched is presently both armed and dangerous.

380.  After officers knew L.M. was not Hibbard, officers frisked him.

381.  The officers lacked an articulable basis to believe L.M. was armed.

382.  The officers lacked an articulable basis to believe L.M. was dangerous.

383.  The identities of all the individual defendants who searched or caused L.M.'s search are not yet known.

384.  No officer objected to the search of L.M.

385.  The officers were implementing city policies by frisking L.M. after they knew he was not the suspect and had no reason to believe L.M. had committed or was going to commit a crime, was armed, or was dangerous.

386.  Lt. Macisso and Jonathan Stearns endorsed the frisk on the scene, observing it and allowing it to continue.

387.  Chief Ahern also later endorsed the frisk as driven by city policies and the officers' training.

388.  As a direct result of Defendants' Fourth and Fourteenth Amendment violations, L.M. suffered injuries listed above.

## Count 4

### 14 M.R.S.A. §§ 8101 *et seq.*
### Assault and Battery

*Brought against all the individual-capacity Defendants.*

389.  Amber and Nathan Miller incorporate and reallege the allegations in paragraphs 1–326, above.

390.  To the extent the individual Defendants were not implementing city policies, they acted in bad faith when seizing L.M. at gunpoint, handcuffing him, and keeping him physically detained after they knew he was not the suspect and had no reason to believe he had committed or would commit a crime.

391.  The individual Defendants intentionally aimed firearms at and handcuffed L.M., or they caused L.M. to have firearms aimed at him and to be handcuffed.

392.  Those actions and threatened actions violated L.M.'s person and dignity, resulting in offensive contact.

393.  The conduct was unreasonable and unlawful.

394.  The conduct was within the officers' scope of employment.

395.  The conduct was beyond the scope of the officers' discretion.

396.  As a direct result of Defendants' tortious conduct, L.M. suffered injuries listed above.

## Count 5

### 14 M.R.S.A. §§ 8101 *et seq.*
### False Arrest and False Imprisonment

*Brought against all the individual-capacity Defendants.*

397.  Amber and Nathan Miller incorporate and reallege the allegations in paragraphs 1–326, above.

398.  To the extent the individual Defendants were not implementing city

policies, they acted in bad faith when seizing L.M. at gunpoint, handcuffing him, and keeping him physically detained after they knew he was not the suspect and had no reason to believe he had committed or would commit a crime.

399.   The individual Defendants intentionally detained L.M., against his will.

400.   L.M. was conscious of his confinement.

401.   The individual Defendants lacked a legal justification for the confinement.

402.   The individual Defendants' conduct was within the scope of their employment.

403.   The individual Defendants' conduct was beyond the scope of their discretion.

404.   As a direct result of Defendants' tortious conduct, L.M. suffered injuries listed above.

## **Count 6**

### **14 M.R.S.A. §§ 8101 *et seq.***
### **Negligence**

#### ***Brought against the Cities of Portland and South Portland (including Chief Ahern in his official capacity).***

405.   Amber and Nathan Miller incorporate and reallege the allegations in paragraphs 1–326, above.

406.   The individual Defendants implemented Portland and South Portland city policies when using their vehicles, weapons, and handcuffs to unreasonably detain and search L.M.

407.   The Cities of Portland and South Portland have waived immunity to the extent that they have procured insurance against liability for claims against the cities or their employees.

408.   The Cities of Portland and South Portland, and their officers, had a duty to exercise reasonable care in the use of equipment to execute warrants, detain suspects,

and search individuals.

409.   The Cities and their officers breached that duty by seizing L.M. and keeping L.M. detained at gunpoint, also using police vehicles and handcuffs, and searching L.M. in handcuffs.

410.   As a direct result of the Cities' negligence, L.M. suffered injuries listed above.

PRAYER FOR RELIEF

Plaintiffs Amber and Nathan Miller, on behalf of their minor son L.M., respectfully request relief as follows:

A.    An award of nominal, compensatory, and punitive damages against all Defendants, for the unconstitutional seizure and search of L.M.

B.    A declaration that L.M.'s rights under the Fourth and Fourteenth Amendments and under Maine law have been violated.

C.    An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988 against all Defendants.

D.    All further legal and equitable relief as the Court deems just and proper.

Dated: January 19, 2026

Respectfully submitted:

/s/ Nealy Fleming
Nealy Fleming
Maine Bar No. 10946
fleming@heron-legal.com

Michael Rogers
Maine Bar No. 10768
rogers@heron-legal.com

HERON LEGAL YOUTH ADVOCACY
4 Moulton St., 3rd Floor
Portland, ME 04101
207-772-7426 (phone)
207-761-5822 (fax)

INSTITUTE FOR JUSTICE

Marie Miller*
Indiana Bar No. 34591-53
3200 N. Central Ave. Ste. 2160
480-557-8300 (phone)
480-557-8305 (fax)
mmiller@ij.org

Jaba Tsitsuashvili*
California Bar No. 309012
901 N. Glebe Rd. Ste. 900
Arlington, VA 22203
703-682-9320 (phone)
703-682-9321 (fax)

* *Pro hac vice* certifications to be filed

*Counsel for Plaintiffs*